UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| MONICA YAROMA, ) | |
| ) | |
| Plaintiff, ) | Civil No: 15-08-GFVT |
| ) | |
| V. ) | |
| ) | **MEMORANDUM OPINION** |
| CASHCALL, INC.; ) | **&** |
| DELBERT SERVICES CORP.; ) | **ORDER** |
| EXPERIAN INFORMATION ) | |
| SOLUTIONS, INC.; and ) | |
| WESTERN SKY FINANCIAL, LLC, ) | |
| ) | |
| Defendants. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon the Motion to Dismiss or Compel Arbitration filed by two of the Defendants, CashCall, Inc. (CashCall) and Delbert Services Corporation (Delbert). [R. 3.] These Defendants ask the Court to dismiss the case based on improper venue under Federal Rule of Civil Procedure 12(b)(3),[1] or in the alternative, to dismiss the case and compel arbitration pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. §1 *et seq*. [R. 3.] The motion has been fully briefed, and the Court held a hearing to further address certain issues concerning jurisdiction and the interpretation of the arbitration provision at issue. For the reasons explained below, the Defendants' motion will be GRANTED to the extent that the Court will compel arbitration and dismiss Plaintiff Yaroma's claims without prejudice.

---

[1] Defendants actually refer to Federal Rule 12(b)(6), but their motion is more relevant to Rule 12(b)(3).

# I

## A

On January 21, 2015, Monica Yaroma, a resident of Shelby County, KY, filed a complaint against Defendants CashCall; Delbert; Experian Information Solutions, Inc. (Experian); and Western Sky Financial, LLC (Western Sky) alleging various violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.*, and the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*, and also requesting declaratory relief in relation to a personal consumer loan she took out with Western Sky. [R. 1.] According to Yaroma's Complaint, Western Sky is a South Dakota limited liability company that offers, originates, and services personal consumer loans to consumers in Kentucky. [*Id.* at ¶ 11.] According to CashCall and Delbert, Western Sky is owned by Martin Webb, who is a member of the Cheyenne River Sioux Tribe (CRST). [R. 3 at 12.]

Yaroma alleges that she obtained an online loan from Western Sky at an annual interest rate of 138.91%, which is illegal and usurious under Kentucky law, thereby making the entire loan void and unenforceable. [R. 1 at ¶¶ 12-29.] Shortly after making the loan to Yaroma, Western Sky apparently sold the loan to Defendant CashCall, a California corporation. [*Id.* at ¶¶ 8, 30.] Subsequently, CashCall referred Yaroma's loan to Delbert, a Nevada corporation, for servicing, and Delbert attempted to collect payment from Yaroma. [*Id.* at ¶¶ 9, 33-46.] After several communications between Yaroma and Delbert, in which Yaroma alleges that Delbert made false representations to her and furnished negative credit information about her loan to consumer reporting agencies, Delbert eventually purchased her account from CashCall. [*Id.* at ¶¶ 45-57.] In July, 2014, Yaroma sent a dispute letter to Defendant Experian, a consumer reporting agency located in California and registered to do business in Kentucky. [*Id.* at ¶¶ 10,

58-59.] Yaroma alleges that her letter to Experian disputed the negative credit information, and argued that her loan is unenforceable because the high interest rate was usurious under Kentucky law. [*Id*. at ¶¶ 58-67.] According to Yaroma, both Experian and Delbert failed to conduct a reasonable investigation of her dispute or assure the accuracy of her credit information. [*Id*.]

**B**

Defendants Cashcall and Delbert[2] move to dismiss Yaroma's complaint based on the doctrine of *forum non conveniens* because the loan agreement included a forum-selection clause stating that the agreement "is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." [R. 3 at 4; R 3-1 at 2.] The loan agreement also states that the borrower consents to the terms of the agreement, the "subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation." [*Id*.] In addition, the agreement states that "your execution of this Agreement is made as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation." [R. 3-1 at 4.] Based on this language, CashCall and Delbert challenge this Court's jurisdiction over the instant dispute, arguing that the Court should enforce the forum selection clause and dismiss the case because the Cheyenne River Sioux Tribal Court is the appropriate venue. [R. 3 at 2-3, 8-10.] CashCall and Delbert also move for dismissal pursuant to the doctrine of tribal exhaustion, which requires that claims implicating an Indian tribe's jurisdiction be brought in tribal court. [*Id*. at 3, 11-15.]

---

[2] Since the time that CashCall and Delbert filed their joint motion, Yaroma has settled her claims with Experian, and Experian will be dismissed from the case. [R. 32.] That settlement is not intended to affect Yaroma's claims against any other Defendant.

In the alternative, CashCall and Delbert request the Court to enforce the arbitration clause in the Loan Agreement and to dismiss Yaroma's claims rather than merely staying them. [*Id*. at 4, 16-20.] The Loan Agreement contains a broad arbitration provision requiring that any disputes and claims related to the agreement be subject to mandatory arbitration in place of going to court. [R. 3-1 at 4-5.] The arbitration provision in the Loan Agreement waives the right to a jury trial, explicitly states that any dispute will be governed by arbitration, and defines a dispute as "any controversy or claim between [the borrower] and Western Sky or the holder or servicer of the note . . . and includes without limitation, all claims or demands, . . . based on any legal or equitable theory." [R. 3-1 at 4-5.] Additionally, the Agreement gives the borrower the right to select from any of several listed arbitration organizations or any other organization agreed to by all the parties. [*Id*.] The Agreement also states in all capital letters that the arbitration provision "is made pursuant to a transaction involving the Indian Commerce Clause of the Constitution of the United States of America, and shall be governed by the law of the Cheyenne River Sioux Tribe." [*Id*. at 6.] CashCall and Delbert argue that under the FAA, the Court should enforce the arbitration agreement according to its terms.

In response, Yaroma contends that both the forum selection clause and the arbitration provisions are unenforceable because the entire contract is void under Kentucky law. [R. 20 at 108.] In particular, Yaroma argues that because Western Sky was not registered as a consumer loan company in Kentucky, it had no capacity to enter into the contract with Yaroma, and therefore any agreement is void *ab initio* due to Western Sky's lack of capacity. [*Id*. at 1-4.] Yaroma also contends that the tribal courts have no subject matter jurisdiction over her claims because no parties to the case are members of the tribe. [*Id*. at 5-6.] She also argues, without presenting any sufficiently supporting evidence, that the CRST does not have any set of

4

procedures for arbitration or for resolving her claims, and therefore choosing the CRST as the arbitral forum is "procedurally and substantively unconscionable." [*Id*. at 6-8, 11-17.]

Thus, Yaroma is attacking the validity of the entire contract, based on lack of capacity and unconscionability. However, courts need not first determine the validity of the underlying contract in order to enforce a forum selection clause or an arbitration clause. *See Shell v. R.W. Sturge, Ltd*., 55 F. 3d 1227, 1232 (6th Cir. 1995). As will be further explained herein, this issue is integrally related to the arbitration clause issue, and the questions of improper forum, tribal exhaustion, and even the contract's validity are all secondary considerations after first determining the validity of the arbitration provision itself. When a contract contains an arbitration agreement, "the arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id*. at 445-46. A federal court need not address whether the entire contract is void or voidable before upholding an arbitration provision under the FAA. *Id*. at 444-46.

The claims in Yaroma's complaint clearly fall within the scope of the FAA. The FAA applies to contracts "evidencing a transaction involving commerce," and further defines "commerce" as including "commerce among the several States," which the Supreme Court has interpreted "as the functional equivalent of the more familiar term 'affecting commerce' – words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power," and which includes debt attributable to loans originating out-of-state. 9 U.S.C. §§ 1, 2; *Citizens Bank v. Alafabco, Inc*., 539 U.S. 52, 55-56 (2003). Because of the broad applicability of the FAA, Yaroma's claims must be analyzed in light of its provisions.[3] In situations such as this,

---

[3] Although Yaroma does not specifically argue that the FAA does not apply because of the Loan Agreement's choice-of-law provision, the Court notes that despite the agreement mandating the use of CRST law [R. 3-1 at 2, 7],

*before* reaching substantive issues of the dispute, courts should first decide the threshold "question of arbitrability," that is, whether parties have submitted the dispute to arbitration. *Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 83-85 (2002). This inquiry is of "limited scope," applying to the "narrow circumstance where contracting parties would likely have expected" a court rather than an arbitrator to have decided the primary issue in dispute. *Id*. at 83-84. In contrast, "procedural questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide." *Id*. at 84 (internal quotation and quotation marks omitted). If the court determines that the dispute "is referable to arbitration" under an agreement to arbitrate, the court must stay all further proceedings in the case "until the arbitration process is complete." *Fazio v. Lehman Bros., Inc*., 340 F.3d 386, 392 (6th Cir. 2003) (citing 9 U.S.C. § 3). Therefore, in light of the Loan Agreement's arbitration provision, the Court must first resolve the question of the enforceability of the arbitration clause before reaching the issues of *forum non conveniens* or tribal exhaustion. *See, e.g. Kemph v. Reddam*, 2015 WL 1510797, *2 (N.D. Ill. March 27, 2015).

## II

### A

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*., "manifests a liberal federal policy favoring arbitration agreements." *Masco Corp. v. Zurich American Ins. Co*., 382 F.3d 624, 626 (6th Cir. 2004) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)) (internal quotation marks omitted). Section 2 of the FAA states that arbitration clauses in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2;

---

such choice-of-law provisions do not preempt the applicability of the FAA. *See Mastrobuono v. Shearson Lehman Hutton, Inc*., 514 U.S. 52, 63-64 (1995).

*see also Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003). Under § 4, when a party is "aggrieved by the failure of another party to arbitrate under a written agreement for arbitration," that party "may petition a federal court for an order directing that such arbitration proceed in the manner provided for" by the contract. *Rent –A-Center, Est, Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010) (quoting 9 U.S.C. § 4) (internal quotation marks omitted). According to the United States Supreme Court, the FAA "places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms." *Id.* (internal citations omitted); *see also AT&T Mobility, LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011).

Under the FAA, when contracts contain arbitration clauses, federal courts "are to examine the language of the contract in light of the strong federal policy in favor of arbitration," and are required to resolve any ambiguities in the agreement or doubts as to the parties' intentions in favor of arbitration. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000); *see also AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986) (explaining that when a "contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be in favor of coverage.") (internal citations and quotation marks omitted). Despite the presumption in favor of arbitration, however, a party cannot be compelled to arbitrate "any dispute that the party has not agreed to so submit." *Bratt Enterprises, Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 612 (6th Cir. 2003).

Before compelling an unwilling party to settle a dispute by arbitration, the Court must apply a two-part test "to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties, and that the specific dispute falls within the

substantive scope of that agreement." *Javitch*, 315 F.3d at 624.  Although the FAA "preempts state laws and policies regarding arbitration," in determining whether a "valid agreement" to arbitrate exists between the parties, the Court should apply state contract law, "provided the contract law applied is general and not specific to arbitration clauses." *Fazio*, 340 F.3d at 392-933 (citing *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 686-87 (1996)).  The Sixth Circuit has recognized, however, that even when applying state-law principles of contract interpretation, "'due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration.'" *Bratt Enterprises, Inc.*, 338 F.3d at 613 (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 475–76 (1989)).  The court then "shall order arbitration upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." *Rent-A-Center*, 130 S. Ct. at 2776 (quoting 9 U.S.C. § 4).

Finally, in evaluating motions to compel arbitration, "courts treat the facts as they would in ruling on a summary judgment." *Kovac v. Superior Dairy, Inc.*, 930 F. Supp. 2d 857, 864 (N.D. Ohio 2013) (quoting other sources).  Therefore, the party opposing arbitration bears the burden of "showing a genuine issue of material fact as to the validity of the agreement to arbitrate." *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002).  The party opposing arbitration also has an evidentiary burden of demonstrating that the arbitration agreement itself, rather than the contract in which it is found, is unenforceable. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).  In doing so, the party "seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue." *Id.* at 91-92; *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991).

**B**

Yaroma primarily argues that the arbitration agreement is unenforceable because the arbitration provisions "are a sham and illusory." [R. 20 at 11-16.] In particular, Yaroma contends that as a "specialized kind of forum-selection clause," arbitration provisions can be set aside if the proceedings would be so "gravely difficult and inconvenient" that the party resisting arbitration would be deprived of her day in court. [*Id.* (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 630-32 (1985).] In support, Yaroma points to the findings of two other district courts that analyzed similar cases to the one at hand and found that the arbitral forum laid out in the Loan Agreement was unavailable and therefore illusory. *See Jackson v. PayDay Fin., LLC, et al.*, 764 F.3d 765, 779-81 (7th Cir. 2014)[4]; *Inetianbor v. CashCall, Inc.*, 962 F. Supp. 2d 1303 (S.D. Fla. 2013). In those cases, both courts emphasized that the CRST lacked any authorized arbitration mechanism available to the parties, the CRST lacked consumer dispute rules, and that it was impossible to select an arbitrator who was an authorized representative of the Tribe, as the arbitration agreement in those cases required. *Jackson*, 764 F.3d at 778-81; *Inetianbor*, 962 F. Supp. 2d at 1307-09. Therefore, the *Jackson* court found that the arbitration agreement was procedurally and substantively unconscionable. *Jackson*, 764 F.3d at 778-79. Based on those cases, Yaroma contends that the arbitration provisions in her loan agreement are also illusory.

The *Jackson* and *Inetianbor* cases, however, addressed very different arbitration provisions than the provision at issue in Yaroma's case. In both those cases, the arbitration

---

[4] Plaintiff's brief actually cites to the district court's response to the appellate court's remand for findings of fact, a copy of which Plaintiff filed in the record. [R. 20 at 12; R. 20-12.] However, the district court's response is not easily found on the usual electronic research databases, and the point for which Yaroma uses it to support her argument is also included in the subsequent appellate opinion in that case. Because the appellate decision has more weight and is more easily found, the Court has chosen to refer to the Seventh Circuit opinion in *Jackson* instead.

agreement specified that arbitration had to be conducted by an authorized representative of the CRST "in accordance with its consumer dispute rules," and further required that arbitration be conducted by "either (i) a Tribal Elder, or (ii) a panel of three (3) members of the Tribal Council." *Jackson*, 764 F.3d at 776; *Inetianbor*, 962 F. Supp. 2d at 1305. The courts found the forum to be illusory because the record before those courts "clearly establish[ed]" that such a forum did not exist, that the CRST does not authorize arbitration or involve itself in the hiring of arbitrators, and that it lacked consumer dispute rules. *Jackson*, 764 F.3d at 776. Such logic does not apply in Yaroma's case because her arbitration agreement contains different language that arguably cures the problems that concerned the *Jackson* and *Inetianbor* courts, and because the record before this Court clearly establishes a very different scenario that does not support a conclusion that the chosen arbitral forum is illusory.

The arbitration agreement at issue here comprises a large portion of Yaroma's Loan Agreement and begins with the words, "Please read this provision of the agreement carefully" in all capital letters and bold type. [R. 3-1 at 4-6.] The clause entitled "Agreement to Arbitrate" is similar to the language of the agreements in *Jackson* and *Inetianbor*, saying:

> You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.

[R. 3-1 at 5.] However, below that provision in the clause entitled "Choice of Arbitrator," we find very different language from that used in *Jackson* and *Inetianbor*. That provision reads:

> Regardless of who demands arbitration, you [Yaroma] shall have the right to select any of following arbitration organizations to administer the arbitration: the American Arbitration Association . . . ; JAMS . . . ; or an arbitration organization agreed upon by you and the other parties to the Dispute. The arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to

10

> Arbitrate. . . .  Any arbitration under this Agreement may be conducted either on tribal land or within thirty miles of your residence, at your choice . . . .

[R. 3-1 at 5.]  Several courts faced with exactly the same issue have agreed that the different language in the above provision allows the consumer to choose an organization such as AAA or JAMS to administer the arbitration, which thereby defeats the argument that the specified forum is illusory or non-existent.  *See, e.g., Hayes v. Delbert Servs. Corp.*, 2015 WL 269483, *3-4 (E.D. Va. Jan. 21, 2015); *Williams v. CashCall, Inc.*, 2015 WL 1219605, *3-6 (E.D. Wis. Mar. 17, 2015); *Kemph v. Reddam*, 2015 WL 1510797 (N.D. Ill. Mar. 27, 2015).[5]

Yaroma contends that despite this "new" language, the language in the "Agreement to Arbitrate" provision conflicts with it by requiring arbitration by a member of the Tribe and by referencing the CRST's non-existent consumer dispute rules, thereby making the arbitration provision a sham.  [R. 20 at 13-14.]  The Court acknowledges that the way the provisions are written could cause some confusion, and notes that at least one other court addressing the exact same provisions has called this a "conundrum."  *See Heldt v. Payday Financial*, LLC, 12 F. Supp. 3d 1170, 1190-91 (D.S.D. 2014).  In fact, when examining this same language the *Heldt* court found that the two provisions were inconsistent with each other, but because the record before that court lacked clarity as to the specific loan agreement at issue, the court expressed its inclination to hold a hearing at which the parties could present evidence as to how the arbitration provision would actually operate.  *Heldt*, 12 F. Supp. 3d at 1192-93.[6]

In Yaroma's case, this Court has already held a hearing at which both parties were asked to explain their position on the wording in the arbitration clauses.  [R. 36.]  At the hearing,

---

[5] The Court acknowledges that two of these cases – *Hayes* and *Williams* – are currently on appeal.

[6] The *Heldt* court decided to defer its ruling on the arbitration clause because the distinctive facts before it led to the conclusion that tribal exhaustion had to occur first.  *Id*.  Those factual distinctions are not present in the case at hand.

11

Defendants emphasized that the first clause (Agreement to Arbitrate) contained the words "except as provided below" and stipulated that those words meant that should any subsequent clauses appear to conflict with the Agreement-to-Arbitrate clause, the subsequent clauses would control. Specifically, the subsequent clause entitled "Choice of Arbitrator" indicates that Yaroma has the right to choose an organization such as AAA or JAMS to conduct the arbitration, and that arbitration does not have to be conducted by a member of the CRST. Defendants also assured the Court that the language in the later provision allowing Yaroma to choose to have the arbitration conducted near her residence also would apply because the language in the Choice-of-Arbitrator clause combined with the words "except as provided below" in the first clause meant that the arbitration does *not* have to take place on the Reservation. Defendants further stipulated that should Yaroma choose AAA or JAMS to conduct the arbitration, the procedural rules for that organization would govern.

As for the applicable substantive law, Defendants assured the Court that the CRST does have a lengthy legal code, and offered the index as an exhibit. Such assurances are supported by the findings in a recent case examining the same question, in which another court found that the CRST had substantive tribal law on contract disputes including contract cases in tribal courts, and noted the existence of the CRST's Commercial Code, Rules of Civil Procedure, and Constitution. *Williams*, 2015 WL 1219605, at *6. Where any gaps exist in the CRST's law, the parties agreed that either federal law or the rules of the organization conducting the arbitration could be used instead. The final decision about which law to apply would be left to the arbitrator, given the broad scope of the arbitration agreement and the typical practice in such situations. Thus, while Defendants conceded that the CRST does not have specific consumer dispute rules, they also stipulated that where necessary the rules of AAA, JAMS, or federal law

12

could apply instead. Again, where, as here, the parties have agreed to arbitrate the entire dispute, the specific choice of what substantive law to apply is more appropriately a question for the arbitrator, and the parties can present arguments to the arbitrator about such laws as needed. *See, e.g., Vimar Seguros y Reseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 541 (1995) (upholding district court's decision to reserve judgment on the question of what substantive law the arbitrators would apply); *Mitsubishi Motors Corp.*, 473 U.S. at 637, n. 19 (finding no need to speculate on which law arbitrators would apply when agreement to arbitrate was enforceable, and when the parties had not yet completed arbitration and could still bring suit afterward if their rights were not adequately protected). Therefore, because alternative gap-fillers exist, the CRST's lack of consumer dispute rules does not render the entire arbitration agreement invalid.

Moreover, Yaroma has failed to provide evidence of the unavailability of the tribe as a forum. Instead of submitting any documentary evidence or affidavits, she has only relied on citations to other cases where the forum was found to be unavailable, which is not an appropriate substitute for presenting her own evidence. *See Chitoff v. CashCall, Inc*., 2014 WL 6603987 (S.D. Fla. Nov. 17, 2014). Based on the Defendants' assurances at the hearing, the Court is satisfied that a proper arbitral forum exists, and therefore the arbitration provisions are enforceable and will not deprive Yaroma of a meaningful way of resolving her dispute. *See Mitsubishi Motors Corp.*, 473 U.S. at 630-32.

## C

Having determined that the arbitration agreement is valid, the Court should also consider its scope. *Fazio*, 340 F.3d at 395; *Javitch*, 315 F.3d at 624. "[I]n deciding whether an issue is within the scope of an arbitration agreement courts should ask if an action could be maintained without reference to the contract or relationship at issue. If it could, it is likely outside the scope

of the arbitration agreement." *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 504 (6th Cir. 2007) (internal citation and quotation marks omitted). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24-25. "Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Mitsubishi Motors Corp.,* 473 U.S. at 628.

Here, Yaroma does not directly contend that her claims are outside the scope of the agreement, nor has she submitted evidence showing that Congress intended to preclude arbitration of her statutory claims at issue. *See Randolph*, 531 U.S. at 91-92. The arbitration provision at issue here is very broad. After beginning with the premise that "any dispute you have with Western Sky or anyone else under this loan agreement will be resolved by binding arbitration," [R. 3-1 at 4], the agreement explains what arbitration means. It also explains in the clause entitled "Arbitration Defined" that:

> A "Dispute" is any controversy or claim between you and Western Sky or the holder or servicer of the Note. The term Dispute is to be given its broadest possible meaning and includes, without limitation, all claims or demands (whether past, present, or future, including events that occurred prior to the opening of this Account), based on any legal or equitable theory (tort, contract, or otherwise), and regardless of the type of relief sought. . . .  A Dispute includes, by way of example and without limitation, any claim based upon marketing or solicitations to obtain the loan and the handling or servicing of my account whether such Dispute is based on a tribal, federal or state constitution, statute, ordinance, regulation, or common law, and including any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement.

[R. 3-1 at 5.] The presumption of arbitrability is "particularly applicable" where, as here, the arbitration clause at issue is broad and includes clauses that submit to arbitration "any and all

14

disputes," or "any differences arising with respect to the interpretation of this contract. . . ." *AT&T Techs.*, 475 U.S. at 650; *see also United Steelworkers of Am. v. Mead Corp., Fine Paper Div.*, 21 F.3d 128, 131-32 (6th Cir. 1994). Yaroma's claims in this case clearly come within this broad scope. Even though part of this dispute involves questions of which substantive law to apply, whether tribal exhaustion plays a role in this case, and the validity of the contract itself, those issues would fall within this broad scope as well.

In addition, it is clear from this agreement overall that even if some confusion existed as to the exact details of how an arbitrator would be chosen, the agreement clearly indicates an intent to arbitrate any related disputes arising from the agreement, and such intent should be enforced. *Nestle Waters N. Am., Inc.*, 505 F.3d at 507-08 ("We are mindful of the Supreme Court's admonition that we should 'not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract....'") (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)). Where ambiguities exist in an arbitration clause, the presumption is still in favor of enforcing arbitration if it was agreed to by the parties and shows an intent to arbitrate. *Stout*, 228 F.3d at 714. The language and structure of Yaroma's Loan Agreement indicate such a strong overall intent to arbitrate that any potential confusion concerning the details of the arbitration process is insufficient to overcome that presumption. Yaroma also does not contend that she was fraudulently induced to sign the agreement, that she did not read it, that she did not understand that she agreed to arbitration, or that she was deceived as to what arbitration meant – rather, her arguments against compelling arbitration focus on the availability of the arbitral forum, which was adequately addressed at the hearing and explained above.[7]

---

[7] Although Yaroma does not specifically contend that she did not know or understand what the Loan Agreement said, to the extent that she might imply such an argument, the Court would remind her that "one who signs a contract is presumed to know its contents." *Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 491-92 (6th Cir. 2001) (citing *Stout*, 228 F.3d at 715).

**D**

Now that the Court has determined the arbitration clause is enforceable, the remainder of the dispute concerning the contract itself and its validity is for the arbitrator to decide. "[I]t is a mainstay of the [FAA's] substantive law that attacks on the validity of the contract, as distinct from attacks on the validity of the arbitration clause itself, are to be resolved by the arbitrator in the first instance, not by a federal or state court." *Nitro-Lift Techs., LLC v. Howard*, 133 S. Ct. 500, 503 (2012) (internal quotation marks and citation omitted).[8] This rationale is largely because "[a]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract," although not in the sense that such provisions are considered "*separate and distinct contracts.*" *Buckeye Check Casing, Inc.*, 546 U.S. at 445. Rather, they are considered "severable" in the sense that courts must examine them for purposes of determining whether the dispute should be arbitrated "because the FAA does not permit the courts to examine the enforceability of contracts containing arbitration provisions." *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 452-53. Therefore, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Casing, Inc.*, 546 U.S. at 445-46.[9]

---

[8] The Court notes that at the end of Yaroma's response brief, she does include an attack on the validity of the arbitration provision itself, but, as explained above, her arguments are based only on cases involving very different arbitration provisions and on the confusion engendered by trying to reconcile the "Agreement to Arbitrate" language with the newer language in the "Choice of Arbitrator" clause. [R. 20 at 11-15.] Based on her misreading of that language, which the Court has already addressed, Yaroma simply asserts that the arbitral forum is a sham but presents no other basis for finding the arbitration provisions unconscionable, induced by fraud, or anything else that would render them invalid. Accordingly, Yaroma's attack on the validity of the arbitration provisions fails.

[9] However, threshold questions of arbitrability, such as the enforceability of the arbitration clause and its scope are generally decided by the court. *Granite Rock Co. v. Int'l Bros. of Teamsters*, 561 U.S. 287, 296 (2010). As explained above, this Court has resolved those threshold questions and leaves the remaining issues to the arbitrator.

Thus, to the extent Yaroma contends she should not be compelled to arbitrate because the entire contract itself is void *ab initio*, the Supreme Court has found that Sections 2 and 3 of the FAA rendering arbitration agreements enforceable when arising out of a "contract" should not be interpreted so narrowly as to only apply to contracts that have already been determined valid. *Id.* at 447-48. Even if an arbitrator later determines that the contract itself is void, courts should not preemptively decline to enforce the arbitration provision or else courts would be able to "deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable." *Id*. at 448-49. Similarly, to the extent that Yaroma contends that Kentucky usury law renders the entire agreement invalid, the Supreme Court has also held that regardless of the intersection of state law on the contract's validity, "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Id*. at 449. Therefore, the remaining issues in this case are more properly resolved by the arbitrator rather than the Court. *Id*.; *Nitro-Lift Techs*., 133 S. Ct. at 503.

### E

Finally, Defendants request that the Court dismiss the action rather than stay proceedings pending arbitration. The Court notes that once an arbitration clause is deemed enforceable, it is proper under 9 U.S.C. § 3 to issue a stay of all further proceedings until arbitration is complete. *See, e.g., Fazio*, 340 F.3d at 392. However, when *all* of the plaintiff's claims in a suit will be referred to arbitration, the case may be dismissed. *Ozormoor v. T-Mobile USA, Inc*., 354 F. App'x 972, 975 (6th Cir. 2009) (affirming district court's order to compel arbitration and dismiss the complaint because although § 3 of the FAA requires a stay of proceedings when a separate claim is referable to arbitration, it does not require a stay when all the claims will be arbitrated); *Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000) (noting that the "[t]he weight of

17

authority clearly supports dismissal of the case when *all* of the issues raised in the district court must be submitted to arbitration") (quoting other sources); *Braxton v. O'Charley's Rest. Properties, LLC*, 1 F. Supp. 3d 722, 728-29 (W.D. Ky. 2014) (collecting cases to explain when dismissal is appropriate rather than a stay). Because the Court has determined that the arbitration provision is enforceable, and that because of its breadth all of Yaroma's claims are subject to arbitration, the Court deems dismissal appropriate. Moreover, because all of Yaroma's claims must be resolved through arbitration, we need not further address the issues of *forum non conveniens* or tribal exhaustion.

### III

Because Yaroma has not met her evidentiary burden of showing that the arbitral forum is unavailable, or that no valid agreement to arbitrate existed between the parties, or that her specific dispute was outside the scope of that agreement, the Court finds that the arbitration agreement controls the instant dispute and must be enforced. Therefore, the case will be dismissed without prejudice.[10] Accordingly, and the Court being sufficiently advised, it is hereby ORDERED as follows:

1. The Defendants' Motion to Dismiss or in the Alternative to Compel Arbitration [**R. 3**] is **GRANTED** insofar as it seeks to compel arbitration.

2. Yaroma's Complaint is **DISMISSED WITHOUT PREJUDICE** pending arbitration.

3. Accordingly, all pending motions[11] [**R. 29, R. 33**] are **DENIED AS MOOT**, and all deadlines are TERMINATED.

---

[10] The Court notes that Yaroma is not left without any recourse, however, because if Defendants do not abide by the concessions they made at the hearing, or if some other misconduct in the arbitration process occurs, she could still bring a post-arbitration challenge to vacate the arbitral award in a separate action if needed. *See* 9 U.S.C. § 10; *see, e.g, Green*, 200 F.3d at 973-74.

[11] The remaining pending motions involve a motion to quash service of process concerning Western Sky and to vacate the entry of default against Western Sky, as well as Yaroma's motion to amend the entry of default. These

4. In light of the explanation provided at the hearing held on September 8, 2015, and given the parties' agreement as to how service was to be executed, the entry of default against Western Sky [**R. 26**] is **VACATED**.[12]

5. The case is now closed and shall be **STRICKEN** from the active docket.

This 16th day of September, 2015.



Signed By:
*Gregory F. Van Tatenhove*
United States District Judge

---

motions all pertain to whether Western Sky was properly served with process through Yaroma's use of certified mail. The parties agreed at the hearing held on September 8, 2015, that Kentucky service law applies to this case and permits service by certified mail, but that Yaroma mistakenly based her motion for entry of default on South Dakota law. Thus, service was proper under Kentucky law, and the entry of default was inappropriately entered based on an incorrect citation to South Dakota law. The parties further agreed that Western Sky's presence in the case does not affect Yaroma's claims or other arguments. Accordingly, the questions of proper service and the entry of default as to Western Sky did not affect the Court's analysis of the instant motion, and now that the case is dismissed and referred to arbitration, these issues are moot.

[12] Further explanation is provided in footnote number 11 above.